The first case is C.R. Bard v. AngioDynamics, 2023-2056. Ms. Maynard. Thank you, Judge Lurie, and may it please the Court, Deanne Maynard for Bard. I'd like to reserve three minutes for rebuttal. The judgment can be reversed on procedure alone. On 101, this Court already held these very patent claims eligible. On indefiniteness, no party raised that issue, so it could not be a proper basis for JMAL. And on anticipation, this Court already held that a reasonable jury could reject AngioDynamics' defense. A reasonable jury did so, and that should have been the end of the matter. Ms. Maynard, we may sympathize with you and even fine for you on 101 and indefiniteness for reasons you've stated, but anticipation is another matter. We held in the last case that the content of the information conveyed by the radiographic matter is printed matter and entitled to no patentable weight. And the district court, that being the case, the district court said, the trial record leaves no room for a reasonable jury to conclude, but that the several prior art references each anticipate the claims. And it repeated, because review of the trial record reveals that the jury had no sufficient basis to reject that Bard's adult titanium port-a-calf and port-ex-port vortex anticipate the claims. So putting aside the radiological markers, it doesn't seem to be much left. Well, I disagree with many parts of that, Your Honor. So on the first appeal, this Court addressed the printed matter issue, as you say. And it held, as you said, that the information conveyed by the radiographic marker is not entitled to patentable weight. But this Court also held that the radiographic marker itself and the means that are claimed, the identifiable means, are entitled to patentable weight. And at pages 1384 to 85, the Court said, this means that the claims require two things. One, that the features are radiographically discernible. And two, that they distinguish or identify the device or its functionality. So what this Court held was printed matter is what it told you. In other words, that it could take the flow rate and the pressure. But the fact that it needed to have a radiographic marker that identified something about the port or its functionality. You're saying that the marker is different from what it conveys? Yes, Your Honor, because it's a radiographic marker. And so it needs to both, as this Court said at 1384 and 85, and I'm quoting, it needs to be radiographically discernible. That's a quote. And it needs to distinguish or identify the device or its functionality. There's actually a few different ways we could read this last sentence of the opinion. And obviously, it'll be up to the Court to decide. But what this sentence is doing is summarizing the evidence that you presented on your side that maybe the features were not radiographically discernible. Maybe these features could not be used to identify or distinguish the device. These features don't communicate its functionality. It's not necessarily saying that all three of those things are required to meet the claim limitation. It's just that this was the evidence you presented. And overall, the conflicting evidence requires us to send it back. So for example, it could not be that we demanded that the features, the radiographic features, somehow communicate the functionality of the court. That's the very printed matter that we basically struck from the claim as being nothing more than unpatentable printed matter. So there's questions here as to how far we should go in terms of expectations on what needed to be proved. But beyond all that, this record is different than the record that existed back in 2020 when we issued this decision. We now have stipulations here from your side saying that, yes, these ports were all discernible, these titanium ports via X-ray. We also have, I believe, concessions from Dr. Johnson, your expert, saying, yes, all these different attributes of, for example, the ATP port are, in fact, discernible by X-ray. He could see them. So because we have a different record, it's not so simple to just transport a statement that there was once upon a time genuine issues of interior effect on record one into what now is a modified bulked up record two. So two points about that, one on the meaning of this court's first opinion. So at page 1382, this court said, we first addressed the printed matter issue. And then after removing the printed matter, we addressed whether or not there's a genuine dispute of material fact for trial. And it held that there was on anticipation. And as our reply brief shows at pages 14 to 17, the evidence that they showed the trial is materially the same as the evidence they showed you the first time, when you conclude there was a dispute of fact. That's one point. The second point is, their supposed concessions on this feature, which are on page 43 of the red brief, they point to three, the three that you just identified. Those are neither new nor concessions of the sort that would require a jury to conclude that they had established their burden by clear and convincing evidence, which is the only way that the JMAL can be sustained, that a jury could only reasonably conclude that the markers that they have are perceivable and serve to identify something about the port. So starting with the first one, they say, as Your Honor said, that Bard stipulated that the titanium ports are visible on x-ray. One, Bard has never disputed that metal is visible on x-ray. The claims require more than that. They require a radiographic marker that tells you something about the port. That's the point of the invention, is that once something's inside somebody's body, that the marker identifies something about the port. When we were here before, no one disputed that the markers had to be shown, that there needed to be something communicated. What was communicated is the information that's printed matter that doesn't get patented away. And that's what this court held. But our summary said that there was conflicting evidence on whether the features of the port are even radiographically discernible. So I mean, you might feel like the record already cleaned that up the first time around, but that was at least one of our bases for sending it back. And there was trial evidence from which a reasonable jury could conclude that they aren't radiographically discernible in any meaningful way. So they say that Bard's expert admitted that titanium port-shaped suture holes and other features are, quote, perceivable via x-ray. And they cite our expert, I think is what you're referring to, at A5965 to 66. But Dr. Johnson, the same expert, he merely agreed that on a high radiation x-ray, one not taken under conditions relevant to the patent claims, you could see ATPs, that's our adult titanium port, shaped suture holes and stem. But he said that those weren't appropriate settings under which to consider the claims, because the claims, of course, require a radiographic marker that you can see once the plant's imported subcutaneously inside a patient. And so he talked about how he had taken that x-ray that they rely on for the adult titanium port, our expert, Dr. Johnson. He said he took it on a table. With 40 times the radiation, you would use it. Is there somewhere in your briefing where you said the concessions of A5965-66 have no relevance here, because he was looking at the wrong x-ray? We say, in our blue brief, we say that the district court ignored the fact, ignored material flaws that we pointed out with their expert's testimony. And that's in the part where we address the radiographic markers. OK. On page 53, Your Honor, the paragraph that starts plus. The district court ignored evidence identifying flaws in that expert's methodology. Bard's expert explained that Angiodynamics' expert had relied on the x-ray taken using non-clinical settings. And it states what I just said to you. He also went through, in that same discussion, he showed the jury. And this is in the record. The pictures are A25789 to 791. He showed the jury x-rays that would be comparable to what it would look like. And he said, from that, you can't tell anything about the port, because when they're in the body, sometimes they're turned askew. And so we did dispute in the trial, just as we had in the first appeal, that the x-rays were perceivable in a way that would allow you to tell anything about the port. And their expert conceded. So Dr. Johnson, as to the other two ports, their expert conceded on cross that, while he could see them in the x-ray, they didn't serve as a marker of anything. You're on the weeds about what is really not patently eligible. I'm in the weeds about patent eligibility, Your Honor? You're in the weeds about what is not patent eligible. So Radiographic maps. Well, so I disagree with that. I think this court's first opinion held that the radiographic marker, the claims require, so if you'd like just to go through one of the claims, the claims require an assembly for identifying a power indomitable A107 in claim one, the independent claim of 417. An assembly for identifying a power injectable vascular access port comprising a first identifiable feature incorporated into the access port perceivable. So the printed matter is later. The printed matter limitation, as the jury was told, is the limitation that tells you it's suitable for accommodating a pressure within the cavity. The information that's conveyed, and that's consistent with this court's precedent, you don't excise printed matter from the claims. The means still get patentable away. And I think on the first appeal, Your Honor, that was uncontested. They did not contest that it was just the information that they collected. What did you say gets patentable away? The means, M-E-A-N-S, the radiographic marker itself, which serves to identify something about the port. The radiographic material, which is perceivable through an x-ray, that is a structural element of the claim. But after that, anything else that's trying to communicate something through that radiographic material, that's printed matter. I disagree, Your Honor. It's the message. Like, I am blue. What it tells you, I can stand a speed at one milliliter per second. I can stand a speed at 35. Claim four says the radiographic marker is selected from a group consisting of an observable pattern, a symbol, a typographical character, an indicium, and combinations thereof. Those aren't very concrete. Those are the means of a radiographic marker. So it's not just a symbol, Your Honor. It's a radiographic. It's a radiographic marker in the shape of a symbol. So even if you thought, for some reason, that the prior art wasn't distinguishable on identifiable feature, the jury was entitled to reject the argument that the prior arts were power injectable within the meaning of the claims. And so they have to win on both. Because if the prior art, they have to show both radiographically, a radiographic marker, which we don't think they did. And we think you should resolve that on procedure alone. They also have to show that the claims could meet the power injectability. The prior art courts could meet the power injectability limitations of the claims. And a reasonable jury could conclude they didn't do so. One. You wanted to save some rebuttal time. You want to keep going or save it? Can I just say one minute about that? Because this is a separate reason for us to prevail. It's your minute. Thank you, Your Honor. So their own documents admit that their report's not power injectable. The evidence showed that changes were made to all three of these prior art courts for them to be power injectable, that persons of skill in the art did not consider them power injectable. And that's enough for a reasonable jury to reject that they proved by clear and convincing evidence that there was anticipation. Thank you, Your Honor. We'll give you three minutes for rebuttal. Thank you, Judge Lori. I appreciate it. Ms. Tully. Thank you, Your Honor. May it please the court. Danielle Tully for Angiodynamics. This case comes down to the claims in the construction. Under the construction that the jury was instructed to apply, clear and convincing evidence established that the asserted claims are anticipated under 102. Throughout the 2022 trial, Bard twisted the construction to evade the prior art. And the only evidence it now cites in support of the verdict ignores the claims, the specification, and the construction altogether. But neither are relevant evidence based on unclaimed features or conclusory statements from its experts that they don't see a limitation in the prior art is substantial evidence that can support the jury's verdict. And while JMAL should be sparingly granted, this is the exception where it's warranted. We're not. If there's conflicting evidence, then we have to go with the jury. Is that right? I would agree with you, Your Honor, except here there was no conflicting evidence. This is not the same record that this court had on summary judgment prior. Additional evidence came in. And I believe, as Your Honor. The experts were in agreement, right? The experts were in agreement across the board at the 2022 trial that the prior reports were visible on x-ray, which is all that the claim construction requires for the radiographic feature. In 2020, when this case was before the court previously, this court noted that there was largely undisputed evidence that the prior art courts were already structured for power injection. That same evidence and more came in at the 2022 trial. With respect to 2020, when this court had the case, this court noted that what was left in dispute was that the experts disagreed whether or not those ports also had radiographic markers. When this case went back down to trial, there was no longer a dispute. That dispute went away. And after that, there was nothing that the jury could have based its verdict on. So as Judge Chen pointed out, we have at APPX 5241, Bard stipulated at trial that titanium vascular access ports were radiographically visible on x-ray before April 27, 2004. At APPX 5965 to 66, Johnson testified that ATP's holes, shape, and outlet stem are radiographically visible. Ms. Maynard raised the x-ray settings that that x-ray was taken at. The claims don't require any specific x-ray settings. They're silent to that. They simply require that it's visible on x-ray. That was shown at trial, and Dr. Johnson agreed as much. Dr. Clark testified that shape is a radiographic marker that identifies the port. And that's at APPX 4889 to 90, APPX 4905, and APPX 4908 to 12. Dr. Clark also testified that the very shape identifiers that angiodynamics pointed to as meeting the radiographic marker limitation would have infringed. And that's specifically at APPX 5061. He said that a square shape could infringe. And at APPX 5061, he also said that a notched shape could infringe. It's undisputed that port-a-calf had a square shape, and the vortex port had a notched shape. And it is axiomatic, your honors, that that which would infringe if later must anticipate if earlier. On Dr. Clark's concession alone, there should be no dispute about the radiographic marker. On the question of whether or not the ports were power injectable, we don't think that there's any dispute whether or not the ports are power injectable. Ms. Maynard referenced some documents of angiodynamics that said that the vortex port was not power injectable. When those documents said that the vortex port was not power injectable, that document was referring to FDA indication. That document was not referring to whether or not those ports were structured for power injection as per this court's claims instruction, which means that it must be suitable for flowing a fluid at 1 milliliter per second, and suitable as well for withstanding cavity pressures at 35 PSI. Those documents do not apply to claim construction, and they are not relevant evidence that could support the jury's decision. And your honor, to the extent that Bard would contend that this court somehow changed the claim construction of the radiographic marker with its 2020 opinion, we would strongly disagree. At no point did this court change the claim construction of the radiographic marker to be anything other than perceivable via x-ray. And Bard certainly didn't ask for it to change the construction of the radiographic marker. To what extent does an identifiable radiographic marker need to specifically identify a particular port versus other ports? I mean, the word identifiable, it could mean a few different things. One is, is it seeable? Is it perceivable? Two, does it identify in the sense that it distinguishes it from every and any other type of port that might be installed in a patient? And the construction here, your honor, is perceivable. Because if it were to be that it needs to distinguish it from every other port that was ever implanted in a patient, as the district court recognized, that would render the claim limitation indefinite. Because it would depend on an unknowable standard of comparing it to every prior port that ever existed, and only on the very- Your Dr. Vogelzang seemed to think that all three of the prior art ports are, in fact, the features that are perceivable are, in fact, so distinctive that you can identify that a given port is an ETP port, or a PAC port, or a Vortex port, based on their shape and other features that you can see via x-ray. That's correct, your honor. And that's what Dr. Vogelzang described as Aunt Minnie. He knows his Aunt Minnie when he sees her, because he knows what his Aunt Minnie looks like. So once he knows what ATP looks like, once he knows what Port-A-Cath looks like, that Port-A-Cath has a square shape and four suture holes situated up in the corner. Vortex has the characteristic knot shape and the tangential outlet stem. Bard's ATP port had two orientation holes and was generally round and larger than the other ports. Once you know that that's what the ports look like, that becomes the identifiable feature. And the patent says as much at APPX 105 in column 25. If we take a look at the bottom of column 25, in one embodiment, at least one physical attribute, e.g. size, shape, et cetera, of an access port may identify the access port as suitable for power injection, or may identify a maximum flow rate or pressure that may be safely accommodated by the access port. The specification doesn't say that a radiographic marker needs to be added to the port. It doesn't say that a particular shape has to be the port. It certainly doesn't say that a unique shape has to identify the port. It says any shape, any physical attribute. And that's the way Bard claimed this, and that's what the claims say. And by arguing anything other than that, Bard's experts weren't arguing about the scope and content of the prior art. They were arguing about the scope and content of these claims, and they were impermissibly changing the claim construction, and that is why all of the evidence that Bard now points to cannot be evidence that could support the jury's decision, because it's simply not relevant. Counsel, do you know if these port-a-cap devices were cited to the examiner, be considered by the examiner? So Bard actually contends in its brief that these ports were before the examiner. But what was before the examiner were the IFUs for these documents, the instructions for use. When I look at the patent to see what's before the examiner, I see hundreds and hundreds of references. Citing references is supposed to be for the purpose of pointing out what may be relevant to patentability. Hundreds, and I see a couple of port-a-cap references, and so you don't know whether those specific ones, I mean, this is an abuse of the patent system, frankly, which is not to a client, it's the opposing client. But do you know whether these are the references? So, Your Honor, what the patent office didn't have, and this actually was a theme throughout the entire trial, what the patent office didn't have was the independent testing that was submitted to the FDA. So Bard, AngioDynamics, and Smith's Medical, the creator of port-a-cap, all independently tested their ports and proved to the FDA that those ports were suitable for power injection so that they could get an FDA indication for power injection. And while the patent office may have had IFUs, instructions for use, on the prior art ports themselves that didn't say that they were power injectable, they didn't have that underlying testing because that underlying testing is not publicly available. But that's what shows that the ports are structurally capable for power injection, and that's the only evidence that matters here. And that evidence cannot be contradicted by conclusory statements of experts that they didn't think that those ports were safe to use because they were not FDA cleared for power injection. Is it true that some of Bard's ATP ports that were tested failed the power injectability limitations? Your Honor, there were certain ports that were built closer to manufacturing constraints that the PowerPort eventually had. So that's how Bard's inventor, Dr. Kelly Powers, actually determined what the structure for the, what the tolerances for the PowerPort that was eventually launched needed to be. But that's just manufacturing tolerances. There were definitely ATP ports that passed power injection. In fact, Bard told the FDA as much. They power injected 30 ATP ports 36 times at the claimed pressures and flow rates and proved to the FDA that the ATP ports were already structured for power injection. That there were some fringe cases where ports would sometimes fail, not even necessarily on the first or second time of use, but on multiple times of use doesn't mean that the ATP port itself was not power injectable. Did Bard dispute whether the prior art showed that these devices were capable of power injection? So when this case was before the court in 2020, Bard did not dispute that those ports were power injectable. That was not part of the summary judgment record. The only thing that- It doesn't matter if they're FDA approved or not, right? It does not matter for purposes of the claim construction. And in fact, the judge actually instructed the jury when giving the jury instructions that FDA indication was not part of the claims. That the only thing that mattered to prove that a port was structured for power injection was that it met the structural capabilities of being able, being capable of withstanding fluid flow rates of one milliliter per second and 35 PSI. This case was already settled? This case has settled, Judge Shen. So are all these other arguments, they're all waived? We don't have to look at them? We don't believe, Your Honor, that the arguments are waived AngioDynamics has not waived them. AngioDynamics, as appellee, does not have the ability to dismiss this appeal. Bard has to dismiss this appeal. So there are still live disputes before this court. And so, while the party's independent agreement may have settled other aspects of this case, the private party's agreement can't change the federal rules of appellate procedure. So unless Bard dismisses this appeal, it is still before this court. So to complete the settlement, you're using the court as a tool, basically, to figure out whether money should be transferred. Bard has not yet dismissed this appeal, Your Honor. But, Your Honor, we do believe that the court need not look beyond the 102 ruling in the J-Mal in order to decide this case. As an alternative ground, the court did raise 101 and 112 in its opinion. But that's based on an alternative construction that's not before this court. We believe that the construction that was before, that was charged to the jury, where a power injectable port was determined based on whether it was structurally capable of withstanding the claimed fluid flow rates and pressures is what controls here. And where the radiographic marker simply needs to be perceivable via X-ray is what controls here. We don't think the court needs to reach 101 or 112 if it decides this case on 102. And unless the panel has any further questions for me. Thank you, counsel. Ms. Maynard has some rebuttal time. And let me ask you, were these watercath references buried in these hundreds of prior art, are they the actual pieces of prior art against, that have been at issue here? So, I don't know the answer to that. I don't know the answer to that standing here, Your Honor, so I don't want to misrepresent. I'm happy to supplement if you would like. But all the facts that counsel just attested to, and this was her closing argument, all of these facts are disputed. I'll start with the power injectability. So, it's not just documents. So on Vortex, Smith, who was an engineer, he admitted that extensive changes were required to make Vortex power injectable. That's at A5519-20. He testified that because of corporate restructuring, they didn't have all the documents they had to scrap their program and start over, and they rebranded it as the smart port, and they changed at least the outlet stem and the port dimensions for the septum compression. That is a chunk of the port. So, the Vortex port, there was evidence before the jury that the Vortex port, the structure of their new power port is different. It can't be prior art, or at least the jury was entitled to conclude that they had it. Did you dispute whether the prior art was capable of power injection? So, capable of was a plain construction they saw, and it wasn't accepted by the court back in many years ago. The court- Is FDA indication required to meet the claim limitation for the power injection limitations? No, Your Honor. But the FDA evidence is relevant. But to her point- The claims just have to show that the courts were capable of power injection, correct? No, Your Honor. So, they saw the capable of. That would make it broader. That might allow some things to be swept in the prior art that don't count. On A311, vascular access port was construed to be a port structured for power injection. It means that, as the jury was told, it has to be suitable for flowing fluid at a fluid flow rate of at least one milliliter per second, and suitable for accommodating a pressure within the cavity of at least 35 PSI. On the Port-a-Cath port, none of the references showed that the port would withstand a cavity pressure of 35. That's A5845 to, that's Volgazang. And then Johnson testified to the same thing around A5975. None of the prior art references showed it could do it. On our port, our expert, they point to the 30, 30 ATPs. What the FDA documents show is that those ATPs were like what the PowerPoint was gonna be like, not that they were identical in the claim construction way to the prior port. And in fact, our witness, Mr. Powers, the inventor, testified that changes were made, including to the manufacturing dimensions and the septum. And the only thing he agreed is that the same base had been used, but not the septum had been changed. And he drew a picture for the jury about the changes made. Are we talking about the ATP right now? Yes, Your Honor. Well, didn't your client Bard submit test results on the ATP to the FDA, saying that it's power injectable, and your inventor's sheets say that, for sure, they're power injectable, and Dr. Johnson admitted that at least some of the ATP ports were power injectable? So the testing, Your Honor, that was a bit. And then there was a stipulation that they were power injectable. I'll address each one of those in turn, Your Honor, if you would like. So the stipulation, it didn't talk about any particular port. It didn't name any particular port. It didn't talk about any time period. So we didn't agree that the ATP port, prior ATP port, met the terms of the claims. The testing that she refers to, the 30, that's what I was talking about. The evidence shows that, and Powers testified, that at least the, quote, septum was different. A4590, he's our inventor. And he distinguished that from the bases, which were hand-selected. But the septum was different. And all the FDA document says is the 30 are like the power port is gonna be. They're like the new. It doesn't weigh over my time. You're way over your time. Thank you for both counsel and the cases submitted. Thank you, Your Honor.